# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of: | No. 54030-4-II<br>consolidated with<br>No. 55010-5-II |
| H.L.M.<br><br>　　　　　　　　　　Appellant. | UNPUBLISHED OPINION |

MAXA, J. – HLM was involuntarily committed to Western State Hospital (WSH) for

mental health treatment for an initial 180 days in August 2017 after a trial court found that she

was incompetent to stand trial on a third degree assault charge. Three more successive 180-day

commitments followed, and HLM remained at WSH through July 2019. In orders entered in

July 2019 and in January 2020, the superior court committed her for two additional 180-day

periods of involuntary treatment. In this consolidated appeal, HLM appeals the two orders.

The superior court's July 2019 commitment order was based on the conclusion that as a

result of a mental disorder, HLM both presented a likelihood of serious harm and was gravely

disabled. The superior court's January 2020 recommitment order was based on the conclusion

that HLM was gravely disabled.

Regarding the July 2019 commitment order, we hold that substantial evidence supports

the superior court's finding that HLM's behavior was the result of a mental disorder as defined in

RCW 71.05.020(37)[1] and therefore that the superior court did not err in concluding that she presented a likelihood of serious harm under former RCW 71.05.320(4)(a) (2018). Regarding the January 2020 commitment order, we hold that there was substantial evidence to support the superior court's finding that HLM was gravely disabled as defined in former RCW 71.05.020(22)(b) (2019).[2] Accordingly, we affirm the superior court's July 2019 and January 2020 commitment orders.

FACTS

*Background*

HLM is a high-functioning autistic woman who has a mild intellectual disability, a schizoaffective disorder, and a personality disorder. In July 2017, the trial court in Snohomish County dismissed a third degree assault charge against HLM without prejudice after finding her incompetent to stand trial, and ordered her committed to a state hospital for evaluation. HLM subsequently was admitted to WSH.

Two professionals at WSH then petitioned the Pierce County Superior Court to order up to 180 days of involuntary treatment. In August 2017, the superior court granted the petition on the grounds that because of mental disorder she (1) presented a likelihood of serious harm, (2) presented a substantial likelihood of repeating acts similar to the charged criminal behavior, and (3) was gravely disabled. HLM's involuntary treatment subsequently was extended through WSH petitions and court orders for additional 180-day periods in February 2018, July 2018, and February 2019.

---

[1] Although other portions of RCW 71.05.020 were amended in 2020, subsection (37) was not. Therefore, we cite to the current version of that subsection.

[2] This definition currently is found at RCW 71.05.020(23).

*July 2019 Commitment Order*

On July 23, 2019, professionals at WSH again sought HLM's involuntary treatment for an additional 180 days. The trial court held a hearing on the petition for recommitment. Nicholas McLain, Ph.D., a psychologist at WSH and one of the petitioners, testified. He stated that HLM suffered from autism spectrum disorder with an accompanying intellectual impairment, schizoaffective disorder, unspecified personality disorder with cluster B traits and borderline characteristics, and mild intellectual disability.

McLain described the symptomatology of each of HLM's disorders. Regarding the autism spectrum disorder, McLain stated that HLM had difficulties and would get upset "with change in routine, things not being followed according to a plan or a routine or schedule." Report of Proceedings (RP) (Jul. 30, 2019) at 10. Regarding the schizoaffective disorder, McLain stated that HLM has described experiencing a "demon that tells her what to do in either auditory or both auditory and visual hallucinations." RP (Jul. 30, 2019) at 10. Regarding the unspecified personality disorder, McLain testified that HLM would "use anger and then sometimes violence either towards herself or violence towards other people as a way to get what she wants or try to control situations." RP (Jul. 30, 2019) at 10.

McLain testified that he personally witnessed HLM slam her head into concrete walls, causing her to bleed from an open wound and requiring outside medical attention. McLain also observed HLM slam her wrist on a countertop, resulting in a fracture. And McLain saw HLM punch herself in the face with closed fists very hard. McLain observed that the frequency of HLM's serious self-harm had increased during the previous 180-day period.

McLain also testified that he personally witnessed HLM become very upset with a staff member, who she charged at to hurt. After being restrained in a chair, HLM flipped the chair

over on the side and broke one of her wrists. On another occasion, McLain observed HLM kick another patient in the chest after the person interrupted HLM's conversation with McLain. McLain stated that the frequency of HLM's attempts to harm others in the previous 180-day period was about once a week.

McLain opined that HLM's self-harming behavior was related to her personality disorder because it appeared strategic, engaging in that behavior to get something. But he also acknowledged that HLM's autism spectrum disorder contributed, as some people with autism head bang and engage in self-harming behavior. McLain opined that the cause of HLM's aggressive and harmful behavior towards others also was her unspecified personality disorder.

McLain stated that HLM continued to present a high risk for seriously hurting herself. She also presented a likelihood of serious harm to others. Over the previous 180 days, McLain observed that WSH staff had to use physical arm restraints on HLM to manage her behavior.

McLain believed that HLM would not be able to meet her health and safety needs if discharged due to her behavior of harming herself and others. In addition, McLain expressed concern for HLM's parents' ability to manage their daughter's behavior in the small, confined space of the trailer where they lived.

On July 30, 2019, the superior court entered an order committing HLM for up to an additional 180 days of inpatient treatment. The court made findings of fact by clear, cogent, and convincing evidence that HLM had a mental disorder and that she was gravely disabled. The court concluded that continued commitment was appropriate because HLM presented a substantial likelihood of serious harm and that she was gravely disabled.

*January 2020 Commitment Order*

On January 17, 2020, professionals at WSH again sought HLM's involuntary treatment for an additional 180 days under former RCW 71.05.320(4). The superior court held a hearing on the petition for commitment. McLain again testified.

McLain testified that HLM was exhibiting threatening behavior. HLM told McClain that she had a list of people that she wanted to kill, particularly WSH staff. McLain noted that these threats were frequent, occurring every three days, and usually specifically directed at staff HLM felt had violated or disrespected her – including threats directed at him personally. McLain also described HLM's violent and aggressive behavior towards others, including WSH staff and her peers.

McLain testified that self-harm continued to be a present problem for HLM. Her treatment notes reflected that there were 24 different instances when HLM had harmed herself during the most recent 90-day treatment plan. He also believed that HLM had been harming herself in private as indicated by frequent bruising on her face.

McLain also recounted two memorable incidents in the previous four or five months where she assaulted and injured a female staff member and a vulnerable patient. And in the previous week or two HLM hit a developmentally disabled patient in the face. In addition, McLain testified that HLM exhibited excessive paranoia as to what staff did or said about her.

Finally, McLain testified that HLM had very strong feelings that she did not want to take her medications and that they did not work. She told him that if she was released she would not comply with treatment or take her medicines. McLain stated his opinion that HLM would not be able to meet her health and safety needs if released. He believed that less restrictive treatment was not appropriate for HLM and that her parents would be unable to safely care for her.

5

On January 23, 2020, the superior court entered an order committing HLM for up to an additional 180 days of inpatient treatment. The court made findings of fact by clear, cogent, and convincing evidence that HLM had a mental disorder and that she was gravely disabled. The court entered a conclusion of law that HLM continued to be gravely disabled, but did not enter a conclusion that she presented a likelihood of serious harm.

HLM appeals the superior court's July 2019 and January 2020 commitment orders.

ANALYSIS

A.      LEGAL PRINCIPLES – INVOLUNTARY COMMITMENT

The "Involuntary Treatment Act" (ITA), chapter 71.05 RCW, governs the temporary detention for evaluation and treatment of persons with mental disorders.

RCW 10.77.050 states, "No incompetent person shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity continues." When the trial court determines that a person is incompetent to stand trial for felony charges, the charges against that person are dismissed without prejudice and the person must undergo a mental health evaluation for the purpose of filing a civil commitment petition. RCW 10.77.086(4).

When a person is found incompetent to stand trial for felony charges under RCW 10.77.086(4), the professional person in charge of a treatment facility may petition under former RCW 71.05.280(3) (2018) for 180 days of involuntary treatment. RCW 71.05.290(3)[3].

Former RCW 71.05.320(4) provides that after the initial 180-day commitment term, the person in charge of the facility in which a person is committed may file a new petition for involuntary treatment on various grounds. One of the grounds involves a person who:

---

[3] RCW 71.05.290(3) has been amended since the events of this case transpired. Because these amendments do not impact the statutory language relied on by this court, we refer to the current statute.

6

> (a) During the current period of court ordered treatment: (i) Has threatened, attempted, or inflicted physical harm upon the person of another, or substantial damage upon the property of another, and (ii) as a result of a *mental disorder*, substance use disorder, or developmental disability *presents a likelihood of serious harm*.

Former RCW 71.05.320(4)(a) (emphasis added.)

Another ground is that a person who currently is involuntarily committed can be recommitted involuntarily at the end of the commitment period for up to an additional 180 days if he or she continues to be gravely disabled. Former RCW 71.05.320(4)(d), (6). Former RCW 71.05.020(22) defines "gravely disabled" as a condition in which a person, because of a mental disorder:

> (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

Former RCW 71.05.020(22). This statute provides two alternative definitions of "gravely disabled," and either provides a basis for involuntary commitment. *In re Det. of LaBelle*, 107 Wn.2d 196, 202, 728 P.2d 138 (1986).

To support an involuntary commitment, a person's likelihood of serious harm and grave disability must be as a result of a "mental disorder." Former RCW 71.05.320(4)(a); Former RCW 71.05.020(22). "Mental disorder" is defined in RCW 71.05.020(37) to mean "any organic, mental, or emotional impairment which has substantial adverse effects on a person's cognitive or volitional functions."

In a civil commitment proceeding, the State has the burden of proving that a person presents a likelihood of serious harm or is gravely disabled by clear, cogent, and convincing evidence. *Labelle*, 107 Wn.2d at 208-09. This standard means that the State must show that the

7

ultimate fact in issue is "highly probable." *Id.* at 209. On appeal, we "will not disturb the trial court's findings . . . if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *Id.*

B.      JULY 2019 COMMITMENT ORDER

HLM argues that the superior court erred in entering the July 2019 commitment order because the State failed to show that (1) her behavior was because of a "mental disorder" as defined in RCW 71.05.020(37); (2) she presented a likelihood of serious harm under former RCW 71.05.320(4)(a); and (3) she was gravely disabled as defined in former RCW 71.05.020(22)(a) and (b).

We conclude that substantial evidence supported the superior court's finding that HLM's behavior was the result of a mental disorder and therefore reject HLM's challenge to the superior court's conclusion that she presented a likelihood of serious harm.

1.      Existence of a Mental Disorder

HLM argues that substantial evidence does not support the superior court's finding that her behavior was the result of a "mental disorder" as defined in RCW 71.05.020(37), which is a requirement for a finding of both a likelihood of serious harm and a grave disability. She claims that her behavior was related to her personality disorder, not to a mental disorder, and that her developmental disability did not qualify as a mental disorder. We disagree.[4]

As discussed above, "mental disorder" is defined in RCW 71.05.020(37) as "any organic, mental, or emotional impairment which has substantial adverse effects on a person's cognitive or

---

[4] Initially, the State argues that HLM waived her argument that her behavior was not caused by a mental disorder because she did not raise that argument in the superior court. However, HLM is making a sufficiency of the evidence claim, which can be raised for the first time on appeal. RAP 2.5(a)(2) (stating that a party may raise "failure to establish facts upon which relief can be granted" for the first time on appeal). Therefore, we consider this argument.

volitional functions." This definition is broad. *In re Det. of R.S.*, 124 Wn.2d 766, 771, 881 P.2d 972 (1994).

HLM contends that the State's evidence established only that her behavior resulted from her personality disorder. However, McLain specifically attributed HLM's harmful behavior towards herself and others at WSH to both her personality disorder and her autism spectrum disorder. McLain described autism as a "neurodevelopmental disorder" that presented difficulties with change in routine. RP (Jul. 30, 2019) at 9. HLM does not argue that autism does not constitute a mental disorder as defined in RCW 71.05.020(37).

In addition, HLM's personality disorder arguably had an adverse effect on her volitional functions. McLain testified in detail about her self-harming behavior and her harming of others, which primarily resulted from her personality disorder. This evidence supports a finding that HLM's behavior was caused by a mental disorder.

HLM cites chapter 71.09 RCW, which provides for the involuntary commitment of sexually violent predators, for the proposition that persons with personality disorders cannot be committed under the ITA. According to HLM, chapter 71.09 RCW was specifically enacted to account for offenders diagnosed with personality orders. But that chapter is intended for persons who meet the definition of "sexually violent predators." RCW 71.09.020(18). Therefore, it is irrelevant to this appeal.

Accordingly, we conclude that substantial evidence supports the superior court's finding that HLM's behavior was the result of a mental disorder as defined in RCW 71.05.020(37).

2. Likelihood of Serious Harm

In the July 2019 commitment order, the superior court concluded that involuntary commitment was warranted because HLM presented a likelihood of serious harm. HLM

assigned error to this conclusion. However, the only argument HLM makes regarding this conclusion is that the likelihood of serious harm was not the result of a mental disorder. HLM does not argue that substantial evidence does not support the superior court's conclusion that she presented a likelihood of serious harm.

Because we reject HLM's only challenge to the superior court's conclusion that she presented a likelihood of serious harm, we affirm the superior court's entry of the July 2019 commitment order based on this ground.[5]

C.     JANUARY 2020 COMMITMENT ORDER

HLM argues that the superior court erred in entering the January 2020 commitment order because the State failed to establish that she was gravely disabled under subsections (a) and (b) of former RCW 71.05.020(22).[6] We disagree and hold that substantial evidence supports the court's order based on subsection (b).[7]

1.     Legal Principles

As noted above, former RCW 71.05.020(22) has two subsections that provide alternate definitions of "gravely disabled." Subsection (a) applies if the person "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." Former RCW 71.05.020(22)(a). Subsection (b) applies if the person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or

---

[5] Because the superior court's conclusion that she presented a likelihood of serious harm supports the commitment order, we need not address HLM's challenge to the superior court's conclusion that she was gravely disabled.

[6] HLM also challenges the superior court's finding of fact that she presented a likelihood of serious harm. However, this finding was not the basis for the trial court's commitment order. And the State concedes that this finding of fact was a harmless scrivener's error.

[7] Because we affirm the superior court's order based on subsection (b), we need not address subsection (a).

volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." Former RCW 71.05.020(22)(b).

To prove grave disability under subsection (b), the State must present evidence that includes "recent proof of significant loss of cognitive or volitional control," as well as a "factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety." *LaBelle*, 107 Wn.2d at 208. This definition has two separate requirements: (1) a severe deterioration in routine functioning and (2) failure to receive treatment that is essential for health or safety. *Id.* at 205.

Regarding the first requirement, the State must provide recent proof of significant loss of cognitive or volitional control. *Id.* at 208. For the second requirement,

> the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety. It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.

*LaBelle*, 107 Wn.2d at 208. The person must be "*unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment." *Id.*

2. Analysis Under Subsection (b)

Here, the State presented evidence that HLM experienced severe deterioration in routine functioning by loss of cognitive or volitional control over her actions. McLain noted the threats HLM directed towards others, as well as violent and aggressive behavior toward WSH staff and other patients. McLain testified that HLM repeatedly had harmed herself in the previous 90 days. McLain also noted that HLM exhibited excessive paranoia as to what staff did or said about her, and that she was resistant to taking medication.

The State also presented evidence that HLM would not receive essential care for her health and safety if released from WSH. McLain testified that HLM did not believe that her medications worked, and she told him that she would not comply with treatment or take her medicines if she was released. McLain opined that HLM would not be able to meet her health and safety needs if released.

We conclude that substantial evidence supports the superior court's finding that HLM was gravely disabled within the meaning of former RCW 71.05.020(22)(b). Accordingly, we affirm the January 2020 commitment order.

CONCLUSION

We affirm the trial court's July 2019 and January 2020 commitment orders.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
SUTTON, A.C.J.

_____
CRUSER, J.