215

[Nos. 24951-1-II; 24862-0-II. Division Two. January 12, 2001.]

*In the Matter of the Detention of* R.A.W., *Appellant,* JAY
KIM, ET AL., *Respondents.*
*In the Matter of the Detention of* D.J.T., *Appellant,*
STEPHEN OPOKU, ET AL., *Respondents.*

216

*Pattie Mhoon*, for appellants.

*Christine O. Gregoire*, *Attorney General*, and *Pamela A. Whipple*, *Assistant*, for respondents.

ARMSTRONG, C.J. — In July 1999, R.A.W. was involuntarily committed for up to 180 days of inpatient treatment at Western State Hospital (WSH). Similarly, in June 1999, D.J.T. was involuntarily committed for up to 90 days at WSH. Both R.A.W. and D.J.T. contend that the trial court erred by instructing the jury (1) to give "great weight to any prior history of decompensation," and that (2) before a less restrictive alternative treatment can be ordered, the outpatient facility designated must agree to assume responsibility for the patient's treatment. R.A.W. and D.J.T. argue that the latter instruction creates a mandatory presumption, relieves the State of its burden of proof, and is an impermissible comment on the evidence. In addition, R.A.W. maintains that the trial court abused its discretion by granting several continuances without good cause; D.J.T. argues that an instruction defining "gravely disabled" was confusing, misleading, and a comment on the evidence.

Both detention orders have expired and so the issues are moot. But the parties urge us to consider the issues because they are of continuing and substantial public interest. The continuance issue turns upon facts unique to R.A.W.'s case, not likely to reoccur and, therefore, not of substantial public interest. We therefore decline to review R.A.W.'s challenge

to the granting of continuances. Similarly, the issue of whether the "great weight" instruction was a comment on the evidence is moot because we have previously decided the issue. *In re Detention of R.W.*, 98 Wn. App. 140, 988 P.2d 1034 (1999) (holding that the "great weight" instruction was an improper comment on the evidence).

But the remaining instruction issues are ongoing and of substantial public interest; accordingly, we review these issues. The trial court erred by instructing that before a less restrictive alternative could be ordered, the outpatient facility must agree to accept the patient. That instruction is inaccurate under *In re Detention of J.S.*, 124 Wn.2d 689, 880 P.2d 976 (1994), and was confusing because whether the court can order such an alternative is not a jury question. We reverse and vacate both R.A.W.'s and D.J.T.'s commitment orders.

## FACTS

### A. R.A.W.

Shortly before R.A.W.'s prior 180-day-involuntary-commitment period expired, Dr. Janet Schaeffer and Dr. Jay Kim petitioned for an additional 180 days of involuntary treatment. RCW 71.05.320(2).[1] The State's petition alleged that R.A.W. presented a danger of serious harm to himself or others as a result of his mental disorder and that there were no less restrictive alternatives in his best interest.[2] R.A.W. demanded a jury trial.

R.A.W. had a history of 12 admissions to WSH and

---

[1] RCW 71.05.320(2) states, in part, that:

[An involuntarily committed person] shall be released from involuntary treatment at the expiration of the period of commitment ... unless the superintendent or professional person in charge of the facility in which he is confined ... files a new petition for involuntary treatment on the grounds that the committed person;

. . .

(d) Continues to be gravely disabled.

[2] Drs. Schaeffer and Kim filed an amended petition on June 11 and a second amended petition on June 21.

several legal infractions. R.A.W. had been "sentenced to [the Department of Corrections (DOC)] in 1996 for choking a nurse, [and] committed under [chapter] 71.05 [RCW] once [the] DOC sentence ended."

The jury found that R.A.W. suffered from a mental disorder and was gravely disabled. The jury also found that "[d]etention for evaluation and treatment at Western State Hospital for a period not to exceed 180 days" was in the best interests of R.A.W. or others.

## B. D.J.T.

D.J.T. had a history of three prior admissions to WSH. In April 1999, Dr. Joanne Ito and Dr. Stephen Opoku petitioned to commit D.J.T. for 90 days of involuntary treatment. D.J.T. had just been committed to WSH under chapter 10.77 RCW.[3] The petition alleged that as a result of a mental disorder, D.J.T. presented a danger of serious harm to himself or others, was gravely disabled, had committed acts constituting a felony, and presented a substantial likelihood of repeating similar acts. The petition also alleged that no less restrictive alternative treatment was in D.J.T.'s best interest.

According to Dr. Ito, a clinical psychologist with WSH, D.J.T. suffered from schizophrenia and was gravely disabled. Based upon his criminal history, Dr. Ito opined that D.J.T. would harm others and that commitment at WSH was in his best interest. Dr. Opoku, D.J.T.'s psychiatrist, testified that D.J.T. had paranoid schizophrenia and that when not in treatment, he "responded to his delusions and hallucinations at various times in a manner that was either unlawful or rather dangerous . . . where he could either be hurt by others or he himself could hurt other people." Dr. Opoku further testified that D.J.T. had no insight into his condition or the need for medication.

D.J.T. had a history of being combative with staff who he thought were plotting to kill him. When served with an eviction notice, D.J.T. threatened to fight the serving detec-

---

[3] Chapter 10.77 RCW provides procedures for the criminally insane.

tive and the accompanying officers. After being subdued with pepper spray, D.J.T. stated that there was a cyanide canister and other explosives on the property that would "blow this place sky high."

The jury found that D.J.T. was suffering from a mental disorder, was gravely disabled, and was not a threat of serious harm to others. The jury also found that "[d]etention for evaluation and treatment at Western State Hospital for a period not to exceed 90 days" was in the best interests of D.J.T. or others. The judge ordered D.J.T. detained at WSH for no more than 90 days, beginning June 1, 1999.

## ANALYSIS

### I. Mootness

■■ Although moot, the parties ask us to review the issues because they are of continuing and substantial public interest. We may review a moot case if it contains "matters of continuing and substantial public interest." *Dunner v. McLaughlin*, 100 Wn.2d 832, 838, 676 P.2d 444 (1984). In determining whether sufficient public interest exists, we consider three factors: "(1) the public or private nature of the question presented; (2) the desirability of an authoritative determination which will provide future guidance to public officers; and (3) the likelihood that the question will recur." *McLaughlin*, 100 Wn.2d at 838. Our Supreme Court has recognized that "the need to clarify the statutory scheme governing civil commitment is a matter of continuing and substantial public interest," *McLaughlin*, 100 Wn.2d at 838, and has reviewed several moot cases under this exception. *In re Detention of R.S.*, 124 Wn.2d 766, 881 P.2d 972 (1994); *In re Detention of G.V.*, 124 Wn.2d 288, 877 P.2d 680 (1994); *In re Detention of Swanson*, 115 Wn.2d 21, 793 P.2d 962, 804 P.2d 1 (1990); *McLaughlin*, 100 Wn.2d 832.

■ *The "great weight" instruction issue is moot because*

we have already decided that the instruction is an improper comment on the evidence. *In re R.W.*, 98 Wn. App. at 145. Accordingly, the trial court erred by giving the instruction.

■ In addition, the question of whether the trial court had good cause to continue R.A.W.'s hearing turns upon facts unique to R.A.W.'s case, which are unlikely to reoccur. Because the commitment order has expired, we decline to consider the issue. We do review the following issues, although moot, because they are of continuing and substantial public interest. *See McLaughlin*, 100 Wn.2d at 838.

## II. Instructions on Ordering a Less Restrictive Alternative

In both R.A.W. and D.J.T., the court instructed the jury that:

> Less restrictive alternative treatment means a court order requiring a person to accept mental health treatment in a setting other than at an intensive treatment facility and may include treatment on an outpatient basis under court imposed conditions deemed appropriate to protect [R.A.W./D.J.T.] and to maintain the person's mental health and safety in the community.

> Before a less restrictive alternative treatment requiring a patient to accept outpatient treatment at a hospital or facility other than the facility providing involuntary treatment is ordered, the outpatient facility designated must agree to assume responsibility for the patient's treatment.

R.A.W. and D.J.T. argue that the second paragraph of this instruction is not an accurate statement of the law because it required the juries to presume that no less restrictive treatment program was available and because there was no testimony that any outpatient facility had agreed to accept either patient. In addition, R.A.W. and D.J.T. contend that the instruction impermissibly commented on the evidence. The State maintains that the instruction is a correct statement of the law and that the juries should know the "practical procedures applicable to placing the individual in an outpatient facility." Moreover, according to the State, the

instruction did not preclude the juries from finding that less restrictive placements were in the best interests of the patients.

■ Jury instructions are read as a whole. *See State v. Tili*, 139 Wn.2d 107, 126, 985 P.2d 365 (1999). Further, "the spirit and intent of the [civil commitment statutes] should prevail over the letter of the law so as to avoid strained or absurd consequences." *In re Detention of A.S.*, 91 Wn. App. 146, 158, 955 P.2d 836 (1998), *aff'd*, 138 Wn.2d 898, 982 P.2d 1156 (1999) (citing *In re Detention of LaBelle*, 107 Wn.2d 196, 205, 728 P.2d 138 (1986)). The court instructed each jury that if they found that R.A.W. and D.J.T. should be involuntarily treated, they must then decide whether less restrictive treatment would be in the best interests of R.A.W., D.J.T., and others. Further, the court instructed each jury that before R.A.W. or D.J.T. could be detained at WSH, "it must be proved by clear, cogent and convincing evidence that no less restrictive treatment is in the best interest[s] of [R.A.W., D.J.T.] and others."

■ We agree with R.A.W. and D.J.T.; the instruction is contrary to the law. The Supreme Court has held that a less restrictive alternative can be ordered even when the treatment is not available or no facility has agreed to assume the responsibility. *In re J.S.*, 124 Wn.2d at 699. The *In re J.S.* court reasoned that:

> The Legislature has emphasized the importance of less restrictive treatment and has, in fact, directed the court to consider less restrictive treatment at each stage of involuntary commitment proceedings. Restricting the court's ability to order less restrictive treatment would not be consistent with this clear legislative intent.

*In re J.S.*, 124 Wn.2d at 698. The court also indicated that language to the contrary in RCW 71.05.230(9)[4] did "not apply directly to the type of treatment or to the hearings at issue in this case [under RCW 71.05.320(2)]." *In re J.S.*, 124

---

[4] RCW 71.05.230 provides procedures for additional treatment for people detained for a 72-hour evaluation and treatment. R.A.W. was completing a 180-day involuntary commitment.

Wn.2d at 698. Finally, the *In re J.S.* court held:

> The Legislature has granted the court the power to determine the best interests of the individual and in so doing, to consider less restrictive treatment. The statutory framework represents a legislative policy choice to create this role for the court. We find that because the court has the power under the statute to order less restrictive treatment, it necessarily has the power to compel compliance with its order.[5]

*In re J.S.*, 124 Wn.2d at 699.

But the State argues that *In re J.S.* does not apply because there the commitment was for a developmentally disabled patient. We find the distinction meaningless. The statutory language requiring that an outpatient facility agree to the commitment before the court order appears only in RCW 71.05.230(9), which sets out the procedure for additional treatment for patients detained on a *72-hour hold.* J.S., although developmentally disabled, was committed under RCW 71.05.320(2). And although the State did not allege the specific statutory authority to commit R.A.W. and D.J.T., the only statutory authority is RCW 71.05.320, the same statute used in *In re J.S.* The limiting language in RCW 71.05.230(9) does not apply here; the instruction is not a correct statement of the law.

■ In addition, even if the instruction is an accurate statement of the law, the court should not have given it. The court, not the jury, orders the commitment either to WSH or to a less restrictive alternative treatment program. The jury question is whether an alternative treatment program is appropriate because it would be in the best interests of the patient or others. RCW 71.05.320(1). At best, then, the instruction is likely to confuse the jury by injecting into their deliberations an issue that is outside their province.

■ "Jury instructions must not be misleading, must permit a party to argue his or her theory of the case and,

---

[5] Chapter 71.05 RCW does not, however, "mandate less restrictive treatment options regardless of their existence or availability." *In re J.S.*, 124 Wn.2d at 701. This "would be a strained interpretation, which is to be avoided." *In re J.S.*, 124 Wn.2d at 701.

when read as a whole, must properly inform the trier of fact on the law." *State v. Valentine*, 75 Wn. App. 611, 616, 879 P.2d 313 (1994), *aff'd*, 132 Wn.2d 1, 935 P.2d 1294 (1997). Here, the instruction that an outpatient facility must agree to the less restrictive alternative treatment is incorrect and submitted an issue to the juries not appropriate for their decision.

### III. Gravely Disabled Instruction—Confusing?

D.J.T. objected to the "gravely disabled" instruction at trial and, on appeal, he contends that the instruction is confusing, misleading, and overemphasizes certain aspects of the case. Instruction 6 stated:

> Gravely disabled means a condition in which a person, as a result of a mental disorder:
>
> (a) is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or
>
> (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving or would not receive, if released, such care as is essential for his or her health or safety.

■ Involuntary commitment may be justified under this second meaning of "gravely disabled" if a person's mental condition has stabilized or minimally improved as the result of an initial commitment, but the person would not receive such care as is essential for his health or safety if released (i.e., his condition would severely deteriorate if released). Commitment under this second definition is also justified if the individual is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment.

D.J.T. argues that the court improperly relied on RCW 71.05.020(1) as a basis for instruction 6. The State's proposed instruction erroneously cited former RCW 71.05.020(1), defining antipsychotic medications, as author-

ity for the instruction. The reference to RCW 71.05.020(1) was apparently carried over from an earlier version of the statute. Since the statute was amended in 1997, former RCW 71.05.020(9) (1999) defines "gravely disabled" and is reproduced with additions in (a) and (b) of instruction 6.

Finally, D.J.T. argues that the trial court selected "only those portions of the *LaBelle* decision that favored the State's case." The *In re LaBelle* court opined that there is a danger that under the "gravely disabled" standard, "persons will be involuntarily committed . . . solely because they are suffering from mental illness and may benefit from treatment." *In re LaBelle*, 107 Wn.2d at 207. The court further held that:

> [W]hen the State is proceeding under the gravely disabled standard . . . it is particularly important that the evidence provide a factual basis for concluding that an individual 'manifests severe [mental] deterioration in routine functioning.' Such evidence must include recent proof of significant loss of cognitive or volitional control. In addition, the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety. It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.

*In re LaBelle*, 107 Wn.2d at 208.

 Here, instruction 6 fairly incorporates the language from *In re LaBelle*. D.J.T. could argue under the instruction that he would "receive . . . such care as is essential for his . . . health or safety" if not involuntarily committed at WSH. *In re LaBelle*, 107 Wn.2d at 208; *see also Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 38, 864 P.2d 921 (1993) (holding that there is no error if the instructions allow each party to argue its theory of the case without undue emphasis or repetition). Here, D.J.T.'s ex-

pert, Dr. Wise, testified that D.J.T. was not gravely disabled because his delusions do not "get in the way of [his] ability to care for [himself]." Dale Sanhei, who allowed D.J.T. to live on his business property for over a year in an old bus and a camper, also testified that he was willing, "[o]ut of the goodness of [his] heart," to allow D.J.T. to return to his business property upon release from the hospital. The instruction allowed the jury to consider D.J.T.'s claim that commitment was not essential because he could function without harmful consequences if released. We reject D.J.T.'s argument that instruction 6 was unclear, misleading, or an impermissible comment on the evidence.

In conclusion, we hold that the trial court erred by instructing that an outpatient facility must agree to accept the patient before the court can order a less restrictive alternative treatment program. The court also erred by giving the "great weight" instruction, which we previously held to be a comment on the evidence.

We reverse and vacate both R.A.W. and D.J.T.'s commitment orders.

BRIDGEWATER and HUNT, JJ., concur.