IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of:<br><br>S.N. | No. 86230-8-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — S.N. appeals a superior court's civil commitment order for 14 days of involuntary treatment, arguing that the superior court's findings of fact are not supported by sufficient evidence and do not support the conclusion that S.N. is gravely disabled. We remand for the trial court to vacate the 14-day commitment order.

FACTS

In January 2024, S.N.'s sister called 911 with concerns about S.N.'s mental health. John Folkestad, a Snohomish County designated crisis responder coordinated with Mukilteo Police to conduct an Involuntary Treatment Act (ITA) investigation at S.N.'s condo. They knocked on the door to S.N.'s apartment and he was agreeable to allow them in. S.N. was immediately irritable, upset at his sister and repeatedly said he was not crazy. He said his sister was behind trying to get him harmed or killed, and had hired several people to try to mess with him, including a boy or child on the floor above him. He showed Folkestad a picture of a hand that was sliced up with several stitches

that he claimed was from his ex-wife, which was not relevant to the investigation or Folkestad's line of questioning. S.N.'s story was disorganized and spoke on unrelated tangents at times, randomly saying "little puppet" without context. He said he had been sleeping with a hammer because he believed he was in harm's way and that he wanted to obtain a firearm. He said he was blocked from obtaining a firearm because of an emergency protection order but that he intended to go to court to get his firearms back because he feared for his safety because of his sister. Police did see a hammer next to his bed and moved it away upon entering the apartment.

That same day, Folkestad filed a petition for detention because of S.N.'s paranoia and delusions. S.N. was admitted to the Telecare North Sound Evaluation and Treatment Facility that same day. While in the facility, S.N. tested positive for cocaine. S.N. has no prior history of being involved in the mental health system.

Detention Hearing

S.N. was represented by counsel in a contested involuntary commitment hearing held six days later. At the hearing, Folkestad was qualified as an expert witness over the objection of defense counsel, who noted that Folkestad was not offering a diagnosis and had not been prior identified as an expert. Folkestad testified to his interactions with S.N. at the condo and that S.N. was exhibiting "all new behaviors" that, according to his sister, was a substantial departure from his baseline functioning three months ago when he previously worked at Boeing as an engineer or mechanic, was independent and had never previously been paranoid or delusional. Folkestad testified that it was unclear to him whether S.N. left his job or was fired. The sister did not testify at the hearing.

Katie Monday, a social worker at Telecare North Sound Evaluation and Treatment Facility, also testified. Monday was qualified as an expert by stipulation. Monday testified that based on the prescriber and rehabilitation group notes, the emergency room paperwork that came with S.N., and having "learned from family and from the client," that prior to October, S.N. did not have any mental health problems. Monday also testified that S.N. reported that his sister and a man named Dan were working together to set him up and that S.N. left numerous notes or messages in various places indicating that if he were to die, they would be responsible. Monday said S.N. reported to Monday that he went to his employer's workplace and shouted out the names of people involved so that they would be exposed.

Monday testified that S.N. has now been diagnosed with brief psychotic disorder, which is a provisional diagnosis for someone who is experiencing psychotic symptoms but has not been observed for a long enough period of time to make a fully formed diagnosis. Monday explained that S.N. exhibited hyperverbal speech, tangential pressured speech, persecutory delusional thoughts, paranoia, disorganization, impaired insight, and irritability.

While in the facility, S.N. was currently taking Zyprexa twice a day, but had refused a dose on two different days. When asked how S.N. was doing in the facility, Monday said S.N. "has been eating well . . . he is getting enough sleep . . . and he is caring for his hygiene just fine. He is able to make his needs known." Monday testified that S.N.'s delusions and paranoia were still present but appeared to have lessened and were not as elaborate as they were previously. When asked about evidence of a baseline to compare S.N.'s symptoms to, Monday responded: "Just what his sister told

me that previous to November, she did not know of any mental health problems. That they lived together, and he would go to work and come home and often be in his room, and she wasn't aware of any problems." Monday testified that she did not believe that S.N. could provide for his health and safety needs because he has had a loss of cognitive and volitional control over time. She believed that if S.N. were to stay and get treatment, the medications would continue to help him and reduce the paranoia and the delusions. When pressed on cross examination to explain specifically how his symptoms caused him to not be able to provide for his health and safety, Monday answered that S.N. reported that he had done quite well working 12 years as an electrician, and while S.N. is not terminated from his job, she understood there is an investigation into his job and "so I'm concerned, how is he going to provide for his essential health and safety needs if he doesn't have a job for finances?" Monday added, while S.N. does have a condo, "he's awfully paranoid about what goes on around the condo."

S.N. moved to exclude as hearsay his sister's statements as relayed by Folkestad, arguing that while Folkestad had been qualified as an expert, "he didn't offer an expert opinion, and he didn't offer a diagnosis. He just relayed hearsay back to what's in his report." The court ruled that it would permit Folkestad's testimony "about his observation" despite the fact that "he wasn't asked if he had a diagnosis or anything like that." S.N. did not testify.

The court ordered that S.N. be detained for up to 14 days after finding him gravely disabled. The court orally held that S.N. has "an inability to provide for his own

4

health and safety in the community" because of his paranoid delusions and need for a hammer for protection. In support, the court found that S.N.'s sister

> indicated to both Ms. Monday and to Mr. Folkestad that he had been employed for a substantial period of time at Boeing . . . the ability to do that, which he apparently doesn't have the ability to do that right now, the testimony from the sister was that previously he has – not from the sister, but the information from the sister which apparently was provided to Ms. Monday and also to Ms. Folkestad because Ms. Monday testified that the DCR, Mr. Folkestad, had provided the information that was the same, consistent with what she had obtained, which was that he has – previously, was not delusional, not paranoid, able to attend to his ADLs[1] and be independent, and was an electrician.

The court found that the above facts demonstrate "a substantial deterioration from what his routine functioning is, and this deterioration [is] the result of a mental health disorder." The court entered a written order committing S.N. for involuntary treatment with findings of fact and conclusions of law on the same day as it's oral ruling.

S.N. appeals.

DISCUSSION

S.N. argues that there is insufficient evidence to sustain the trial court's findings that he was gravely disabled, and so the 14-day involuntary commitment order must be reversed.

The burden of proof at a 14-day involuntary commitment hearing is preponderance of the evidence. RCW 71.05.240(1), (4); see also In re Det. of A.F., 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021). A person suffering from a mental disorder can be found gravely disabled under two different statutory definitions. The first definition requires the court to consider if the person "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of

---

[1] Activities of Daily Living.

health or safety." RCW 71.05.020(25)(a). Under the second definition, the court considers if the person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(25)(b). The trial court's written order with findings and conclusions found that S.N. met both of the above definitions.

On review, we consider whether the trial court's findings of fact are supported by substantial evidence and if those findings support the court's conclusions of law and judgement. A.F., 20 Wn. App. 2d at 125 (citing In re Det. of T.C., 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019)). The meaning of substantial evidence is a "quantum of evidence sufficient to persuade a fair-minded person." In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015). When considering sufficiency of the evidence, we view the evidence in the light most favorable to the State. In re Det. of B.M., 7 Wn. App. 2d 70, 85, 432 P.3d 45 (2019). This court does not review determinations by the trial court as to witness credibility. H.N., 188 Wn. App. at 763.

A. RCW 71.05.020(25)(a)

The court found that S.N. was gravely disabled because of his "inability to provide for his own health and safety in the community," based on his paranoia and need to sleep with a hammer.

The ITA requires that the State prove that S.N. "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." RCW 71.05.020(25)(a). Under this subsection, the State must "present recent, tangible evidence of failure or inability to provide for such essential human needs as

6

food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." In re Det. of LaBelle, 107 Wn.2d 196, 204-05, 728 P.2d 138 (1986).

Here, there is no evidence that S.N. was unable to provide for his essential needs. At the hearing, Monday testified that S.N. "has been eating well . . . he is getting enough sleep . . . and he is caring for his hygiene just fine. He is able to make his needs known." There was no testimony that S.N.'s condo was in a state that suggested he could not provide for his essential needs.

Monday testified that she was concerned that S.N. would not be able to provide for his essential health and safety needs if he no longer had a job. First of all, the record does not support that S.N. was unemployed. In fact, Monday testified that S.N. had not been terminated from his job, but that his job was under investigation. Even so, a lack of financial resources will not alone justify continued confinement in a mental hospital. Id. at 210. Second, though S.N. demonstrated paranoid thinking, this was not a manifestation of severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions. And there was no evidence that S.N. was not receiving such care as is essential for his or her health or safety.

Because the record is devoid of any evidence that S.N. was unable to meet his essential needs, we agree with S.N. that the finding that he was gravely disabled under RCW 71.05.020(25)(a) is not supported by the evidence.

B. RCW 71.05.020(25)(b)

S.N. also argues that he did not "manifest[] severe deterioration in routine

functioning" because the State failed to introduce substantial, non-hearsay evidence as to his baseline functioning.

The ITA alternatively defines a condition of grave disability as one where the person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety."  RCW 71.05.020(25)(b).

> Involuntary commitment may be justified under this second meaning of "gravely disabled" if a person's mental condition has stabilized or minimally improved as the result of an initial commitment, but the person would not receive such care as is essential for his health or safety if released (i.e., his condition would severely deteriorate if released). Commitment under this second definition is also justified if the individual is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment.

In re Det. of R.A.W., 104 Wn. App. 215, 224, 15 P.3d 705 (2001) (citing former RCW 71.05.020(1)(b) (2000)).

The Washington Supreme Court recognized that legislative intent for this alternative definition of grave disability was to pivot away from policies that prevented care for chronically ill persons "until they had decompensated to the point that they were in 'danger of serious . . . harm,'" which had previously presented a "revolving door" treatment problem because intervention could not be offered "before a mentally ill person's condition reache[d] crisis proportions."  LaBelle, 107 Wn.2d at 206-07 (citing former RCW 71.05.020(1)(b) (1979)).  To that end, the Court has held that a strict reading of this test could

> result in absurd and potentially harmful consequences, for a court would be required to release a person whose condition, as a result of the initial commitment, has stabilized or improved minimally—*i.e.*, is no longer "escalating"

8

—even though that person otherwise manifests severe deterioration in routine functioning and, if released, would not receive such care as is essential for his or her health or safety.

Id. at 207. But the State must show evidence of "recent proof of significant loss of cognitive or volitional control" and "a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety." Id. at 208.

Here, the court held that testimony about S.N.'s job and his current unemployment along with testimony about S.N.'s recent delusions and paranoia demonstrate "a substantial deterioration from what his routine functioning is, and this deterioration in the result of a mental health disorder."

Monday testified that S.N.'s delusions and paranoia were still present but appeared to have lessened and were not as elaborate as they were previously. Monday explained that "[w]e would like to see him taking [the medication] regularly before making any changes." However, there is no evidence that S.N. would decompensate such that S.N. would not receive care as is essential for his health or safety. "It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be shown to be essential to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered." Id. at 208. "[M]ental illness alone is not a constitutionally adequate basis for involuntary commitment." Id. at 201.

Lastly, though S.N. slept with a hammer, he testified it was because he felt he was in harms way. And while he expressed a desire to obtain a firearm, he

acknowledged that he was barred from doing so because of a protection order and would have to go to court in order to be permitted to obtain a firearm. This is not evidence of a loss of cognitive or volitional control. There is "no constitutional basis for confining . . . [mentally ill] persons involuntarily if they are dangerous to no one and can live safely in freedom." Id. at 207 (quoting O'Connor v. Donaldson, 422 U.S. 563, 575, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975)). Monday's testimony, while based on recent observations, tends only to prove that S.N. was still suffering from a mental disorder; it does not establish by a preponderance of evidence of grave disability as a result of the mental disorder.

We remand for the trial court to vacate the 14-day commitment order.

_Cohen, J._

WE CONCUR:

_Birk, J._

_Brennan, J._