# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of H.W. | No. 86954-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — H.W. appeals her 14 day involuntary commitment under chapter 71.34 RCW, which provides for the civil commitment of minors in need of behavioral health care and treatment. She argues that the superior court's findings that H.W. posed a substantial risk of harm to herself and that H.W. was not a good faith voluntary patient were not supported by substantial evidence. Alternatively, H.W. argues that the court erred in finding that a less restrictive alternative treatment was not in the best interests of H.W. or the community. Because there was substantial evidence supporting the superior court's findings, we affirm.

I

On June 30, 2024, after a referral from the Seattle Children's Hospital Behavioral Health Unit, a King County Designated Crisis Responder filed a petition for the initial detention of H.W., a 16 year old girl admitted to Seattle Children's Hospital on June 22. The petition alleged that H.W. exhibited a behavioral health disorder "demonstrated by paranoia, delusions, mood lability, emotional

dysregulation, [and] audio hallucinations;" that she was "no longer appropriate for parent initiated treatment due to her lack of medication compliance," and that H.W. was "unsafe for discharge home."

On July 5, staff at Seattle Children's Hospital Inpatient Psychiatric Unit filed a petition for 14 day involuntary treatment pursuant to RCW 71.34.070. This petition further alleged that H.W. presented a likelihood of serious harm to herself, was gravely disabled, and that less restrictive alternatives to detention were not in H.W.'s best interest.

On July 8, after a probable cause hearing before a court commissioner at which H.W. her mother, R.Z., and a court evaluator testified, the court dismissed the allegation that H.W. was gravely disabled but ordered H.W. involuntarily committed on the grounds that she presented a likelihood of serious harm to herself.

R.Z. testified that, around 2020 or 2021, H.W. began to show occasional signs of hallucinating and having "non-reality based kind of thoughts." R.Z. testified about witnessing H.W. attempt suicide about one year before the probable cause hearing:

> [H.W.] ran into the bathroom and grabbed a bunch [of] pills, and I said, don't. And she—she stood there and looked at me for a minute, and then she took them all, . . . she grabbed a handful of them and shoved them in her mouth, and I called [911] and I made her throw up. . . . I told her she needed to throw up and she did. She stuck her fingers down her throat.

From 2022 to June 2024, according to R.Z., H.W. was "in and out" of hospitals "like, ten times" for psychiatric treatment.

The day before H.W. was admitted to Seattle Children's Hospital, she had been discharged from Tacoma General Hospital into the care of R.Z. According to R.Z.'s testimony, the following day, while she was driving H.W. to the store, H.W. became "fearful and scared" and told R.Z., "I need you to pull over and I need to scream." R.Z. pulled into a church parking lot, where H.W. got out of the car and ran into the woods. R.Z. called 911. R.Z. testified that after some time, H.W. returned,

> screaming at the top of her lungs that I was allowing her to be raped and that I had allowed her to be raped in the hospital and that I was pimping her out to the hospital, and if it happened again she was going to commit suicide, that she was going to kill herself. And she said that over and over again.

H.W. told R.Z. that she wanted to die, and asked R.Z. to " 'kill [her] with that shot that they can give you that will kill you.' "

According to R.Z., H.W. calmed down "significantly" after about 40 minutes, at which point she agreed to go to the hospital. Although H.W. "retract[ed]" her agreement by the time they got to the hospital, H.W. was admitted to Seattle Children's Hospital that afternoon. During her intake interview, she denied suicidal or homicidal ideation and denied auditory verbal hallucinations.

The court evaluator testified that H.W.'s insight "wax[ed] and wane[d]" during her hospitalization. During her time at Seattle Children's Hospital, H.W. exhibited paranoia, responding to internal stimuli, screaming, and hallucinations, and "scream[ed] and ma[de] accusations . . . towards staff, specifically related to trauma." On June 26, H.W. endorsed passive suicidal ideation.

3

H.W. initially agreed to take paliperidone, a mood stabilizing medication, on July 4. She then refused the medication for several days, informing a staff member that she did not want to take it and refusing to explain her concerns. H.W. took the medication for the first time on July 7, the day before the hearing.

The court evaluator testified that, as of the probable cause hearing on July 8, H.W. "[had] begun to stabilize" and was showing signs of "emerging insight," but that her insight still "wax[ed] and wane[d]." H.W.'s primary diagnosis at the time of the hearing was "unspecified schizophrenia spectrum and other psychotic disorder," with a secondary diagnosis of "polysubstance use," "a substance-induced psychosis." The court evaluator testified that she believed H.W. posed a risk of physical harm to herself if she stopped receiving therapeutic and medication treatment. R.Z. testified that she was "extremely concerned" about the prospect of H.W. being discharged from the hospital.

According to the court evaluator, H.W.'s healthcare providers at Seattle Children's Hospital recommended that H.W. be placed in a locked residential facility such as "CLIP."[1] The hospital considered less restrictive alternatives but determined that a locked treatment facility was the "only option" because there were not many alternatives within a reasonable distance of H.W.'s home. Additionally, because H.W. had "a history of self-discharging from voluntary residential treatment facilities," such facilities would not accept her back. The court

---

[1] *Children's Long-term Inpatient Program (CLIP)*, WASH. HEALTH CARE AUTH., https://www.hca.wa.gov/about-hca/programs-and-initiatives/behavioral-health-and-recovery/childrens-long-term-inpatient-program-clip (last updated May 2025).

evaluator also stated that H.W. was "a poor faith patient in terms of . . . engaging . . . in lower restrictive therapies."  H.W. testified that she was "willing to go to CLIP," but "would like to wait at home instead of at the hospital."  She also stated, "But honestly, I don't really feel . . . much of a need to go to CLIP."

At the end of the probable cause hearing, the superior court ordered H.W. committed to Seattle Children's Hospital for 14 days.  The following day, H.W. moved for revision of the commissioner's order.  On July 12, a superior court judge denied the motion for revision and the court adopted the commissioner's findings and conclusions as its own.  H.W. appeals.

II

When reviewing an involuntary commitment order, we consider whether the findings of fact are supported by substantial evidence and whether those findings support the superior court's conclusions of law.  In re Det. of K.P., 32 Wn. App. 2d 214, 221, 555 P.3d 480 (2024), review denied, No. 103607-8 (Wash. Mar. 5, 2025).  We accept unchallenged findings as true.  Id.  Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person that the premise is true.  Id.  If substantial evidence supports the findings, we will not substitute our judgment for that of the trial court.  Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003).

H.W. challenges three findings of fact as unsupported by substantial evidence: first, that H.W. was " 'unwilling or unable in good faith to consent to voluntary treatment,' " second, that H.W. " 'present[ed] a likelihood of serious

5

physical harm' " to herself, and third, that "a less restrictive alternative . . . [was] 'not in [H.W.'s] best interest.' " (Last alteration in original.)

A

H.W. first argues the superior court erred in finding that H.W. was " 'unwilling or unable in good faith to consent to voluntary treatment.' " Before the court can order a 14 day involuntary commitment, the court must find that "[t]he minor is unwilling or unable in good faith to consent to voluntary treatment."[2] RCW 71.34.740(9)(c).

In finding that H.W.'s case met the statutory requirement, the superior court cited testimony from the court evaluator that H.W. refused to take paliperidone for several days after she was prescribed it. The court also noted that H.W. had stated she did not think she needed to go to CLIP and that the court was "not convinced by [H.W.'s] testimony that [she] would actually follow through" on treatment recommendations. Furthermore, the State points out that H.W. continued to resist her treatment providers' advice that she remain in the hospital prior to and throughout the hearing.

Substantial evidence supported the finding of fact that H.W. was not in complete compliance with all hospital recommendations, and that she continued to resist the recommendations of her care team up to the date of the hearing.

---

[2] Chapter 71.34 RCW does not further define this requirement. However, the involuntary treatment act, which provides for the civil commitment of adults (RCW 71.05.010(1), .240), states that, for the purposes of that statute, a person qualifies as a "good faith volunteer" if they "abide by procedures and a treatment plan as prescribed by a treatment facility and professional staff." RCW 71.05.240(3).

Based on this evidence, although a trier of fact could have reasonably evaluated the evidence differently, a fair-minded person could conclude that H.W. was unwilling or unable in good faith to consent to voluntary treatment. Thus, the superior court's finding of fact was supported by substantial evidence.

B

H.W. next argues that the superior court erred in finding that H.W. " 'present[ed] a likelihood of serious physical harm . . . to herself.' " A minor presents a likelihood of serious harm to herself when there is "[a] substantial risk that . . . [p]hysical harm will be inflicted by a minor upon his or her own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on oneself." RCW 71.34.020(39)(a)(i). Under the act that concerns the civil commitment of adults (RCW 71.05.010(1), .240), which contains a substantively similar definition of "likelihood of serious harm,"[3] a substantial risk of physical harm must be evidenced by a "recent overt act" which has either "caused harm" or "creates a reasonable apprehension of dangerousness," such as "threats or attempts to commit suicide or inflict physical harm on one's self." In re Det. of Harris, 98 Wn.2d 276, 284-85, 654 P.2d 109 (1982); RCW 71.05.020(37)(a)(i).

In finding that H.W. presented a likelihood of substantial harm to herself, the superior court relied on testimony from R.Z. and from the court evaluator, both of whom the court found to be credible. R.Z. testified that she witnessed H.W.

---

[3] " 'Likelihood of serious harm' means . . . [a] substantial risk that . . . [p]hysical harm will be inflicted by a person upon his or her own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on oneself." RCW 71.05.020(37)(a)(i).

7

attempt suicide about one year prior to the hearing. She also testified that H.W. believed people were going to kill her and that H.W. had requested knives and weapons to protect herself. Furthermore, R.Z. testified that immediately before H.W. was admitted to Seattle Children's Hospital, H.W. made multiple threats of suicide during a delusional episode. The court evaluator testified that H.W. had endorsed passive suicidal ideation while in the hospital), that H.W.'s behavioral health condition made her likely to make impulsive decisions and engage in high-risk behaviors "that could end in death," and that with H.W.'s "particular mental disorder," insight "will wax and wane."

H.W. emphasizes that her suicide attempt had been a year earlier, arguing that it "alone" did not demonstrate a risk of harm. But the evidence included this past suicide attempt and in addition recent delusional thinking, threats of suicide, passive suicidal ideation, and a diagnosis H.W.'s providers characterized as involving waxing and waning insight and risk of impulsive, high-risk, and potentially life-threatening behaviors. Taken together, this was substantial evidence supporting the superior court's finding that H.W. posed a substantial risk of physical harm to herself.

C

Third, H.W. argues the superior court erred in finding that " 'a less restrictive alternative . . . [was] not in [H.W.'s] best interest." (Last alteration in original.) Citing RCW 71.34.740, H.W. contends that the court must order a less restrictive alternative treatment option if it is in the child's best interests. RCW 71.34.740(9)(b) states that, to order a 14 day commitment, the court must find that

8

"[t]he minor is in need of evaluation and treatment of the type provided by the . . . facility . . . to which continued inpatient care is sought or is in need of less restrictive alternative treatment to be found in the best interests of the minor or others." RCW 71.34.740(10) states that "[i]f the court finds that the minor meets the criteria for a [14] day commitment, the court shall either authorize commitment of the minor for inpatient treatment or for less restrictive alternative treatment upon such conditions as are necessary."

Quoting In re Detention of R.A.W., H.W. asserts that the court is required to order a less restrictive treatment option "even if . . . 'the treatment is not available or no facility has agreed to assume responsibility.' " 104 Wn. App. 215, 222, 15 P.3d 705 (2001). R.A.W. concerned jury instructions given in the context of petitions for 180 day and 90 day involuntary commitment of an adult. Id. at 217. The trial court in both cases instructed the jury that a less restrictive alternative treatment could not be ordered unless the designated treatment facility agreed to assume responsibility for the patient's treatment. Id. at 221. This court held that this instruction was an inaccurate statement of the law because a less restrictive treatment can be ordered "even when the treatment is not available or no facility has agreed to assume the responsibility." Id. at 222. R.A.W. did not hold that courts were required to order less restrictive alternative treatment in these circumstances, regardless of the best interests of the patient and the community. See id. at 222, 226.

9

In this case, the superior court considered less restrictive alternative treatments and determined that they were not in the best interests of H.W. or the community. In its written findings of fact, the court stated that

> a less restrictive alternative is not currently appropriate or in the best interests of [H.W.] or [the] community because she has a history of prematurely discharging herself from outpatient care, is still exhibiting symptoms of her mental health disorder, and has not been consistently compliant with medications or a treatment plan.

These findings are supported by the court evaluator's testimony that H.W. had refused to take paliperidone, had exhibited symptoms of paranoia and lability and had verbally lashed out at staff while in the hospital, and that a less restrictive facility had declined to accept her because she had a history of discharging herself from voluntary treatment programs. The superior court's finding that a less restrictive alternative was not in the best interests of H.W. or the community was supported by substantial evidence.

III

Because the superior court's findings regarding the contested elements were supported by substantial evidence, we affirm the trial court's order committing H.W. for 14 days.

Birk, J.

WE CONCUR:

, ACJ Smith, J.

10